Argued and submitted May 5, 1995, decision of the Court of Appeals affirmed in part and reversed in part; judgment of the circuit court reversed, and case remanded to the circuit court for further proceedings July 18, 1996

STATE OF OREGON,
*Respondent on Review /*
*Petitioner on Review,*

*v.*

MARK MICHAEL KITZMAN,
*Petitioner on Review /*
*Respondent on Review.*

(CC 922182; CA A77967; SC S41724, S41793)
(Consolidated for Argument and Opinion)

920 P2d 134

Alan M. Dershowitz, Cambridge, Massachusetts; Victoria B. Eiger, of Dershowitz & Eiger, P.C., New York, New York; and Lawrence Matasar, Portland, argued the cause and filed the briefs for petitioner on review/respondent on review. With Ms. Eiger on a brief was Nathan Z. Dershowitz.

Virginia L. Linder, Solicitor General, Salem, argued the cause for respondent on review/petitioner on review. With her on the briefs were Theodore R. Kulongoski, Attorney General, and Ann Kelley, Assistant Attorney General.

Before Carson, Chief Justice, and Gillette, Van Hoomissen, Fadeley, Graber, and Durham, Justices.**

GRABER, J.

Van Hoomissen, J., filed a concurring opinion in which Gillette, J., joined.

Durham, J., filed a concurring opinion.

** Unis, J., retired June 30, 1996, and did not participate in this decision.

## GRABER, J.

A jury convicted defendant of 14 counts of rape,[1] sexual abuse,[2] and unlawful sexual penetration,[3] involving three children: M, who is defendant's son, and L and L2, who are the daughters of a woman with whom defendant was romantically involved. At the time of trial, M was six, L was eight, and L2 was three; the events leading to the convictions had occurred several months earlier. The Court of Appeals affirmed the convictions for crimes involving L, but reversed the convictions for crimes involving M and L2. *State v. Kitzman*, 129 Or App 520, 532, 879 P2d 1326 (1994). On review, we reverse all the convictions and remand the case to the trial court for further proceedings.

## I. FACTS AND PROCEDURAL BACKGROUND

In June 1991, defendant and Ms. Gordon began a romantic relationship. By August 1991, defendant and Gordon were regularly spending almost every night together, at either defendant's or Gordon's home, with the three children (M, L, and L2) present.

By January 1992, the relationship between defendant and Gordon had ended. After the relationship ended, L told her mother that defendant had sexually molested her. L also stated that she had seen defendant sexually molesting

[1] ORS 163.375(1)(b) provides:

"A person who has sexual intercourse with another person commits the crime of rape in the first degree if:

"* * * * *

"(b) The victim is under 12 years of age[.]"

[2] ORS 163.427(1)(a)(A) provides:

"A person commits the crime of sexual abuse in the first degree when that person:

"(a) Subjects another person to sexual contact and:

"(A) The victim is less than 14 years of age[.]"

[3] ORS 163.411(1)(b) provides in part:

"[A] person commits the crime of unlawful sexual penetration in the first degree if the person penetrates the vagina, anus or penis of another with any object other than the penis or mouth of the actor and:

"* * * * *

"(b) The victim is under 12 years of age[.]"

M. Shortly thereafter, M and L2 made statements to family members that implicated defendant in sexual molestation of them as well. Those allegations were reported to law enforcement officers. Defendant was indicted on five counts of first degree rape and three counts of first degree sexual abuse of L, two counts each of first degree sexual abuse and first degree unlawful sexual penetration of M, and one count each of first degree sexual abuse and first degree unlawful sexual penetration of L2.

Before trial, the trial court held a hearing, pursuant to OEC 803(18a)(b) (1991),[4] to determine whether M and L2 were competent and available to testify at defendant's trial.[5] The court ruled that, under the statute, defendant was not permitted to be present at the hearing while the children were testifying, nor was he allowed to examine the children at that hearing. Defendant was excluded from the hearing while the court conducted a brief examination of each child to determine whether each was available to testify at trial. During those examinations, defendant's counsel was present, but defendant was not, and defense counsel was not allowed to examine the children. Defendant, through counsel, was present for the remainder of the pretrial availability hearing, when other witnesses testified as to the children's statements and the circumstances in which they were made. Defendant's counsel was permitted to examine those witnesses.

The court ruled that L2 was unavailable to testify because of her young age and an inability to communicate in a court setting. The court ruled that M was unavailable to testify, because he would be likely to suffer lasting and severe emotional trauma from testifying. The court held that M's and L2's out-of-court statements were admissible under OEC 803(18a)(b) (1991), because they were corroborated and because they contained sufficient indicia of reliability. Before trial, the court also denied defendant's motion to dismiss the charges or, in the alternative, to exclude evidence, on the

---

[4] The pertinent text of OEC 803(18a)(b) (1991) is found at 323 Or at 600 n 14 below.

[5] At that hearing, the court was required, among other things, to determine whether M and L2 were competent and available to testify at trial. Despite the variety of subjects considered at the hearing, for the sake of simplicity we will refer to it in this opinion as the "pretrial availability hearing."

ground that the evidence was obtained in violation of ORS 418.747 (1991).[6]

L testified at trial. M and L2 did not testify. Numerous out-of-court statements made by M and L2 to Gordon, to Gordon's husband, to defendant's ex-wife, to L's grandmother, to a teacher, to a therapist, and to a detective were admitted in evidence under OEC 803(18a)(b) (1991).

Defendant was convicted on all counts. He appealed. The Court of Appeals held that OEC 803(18a)(b) (1991) did not require the trial court to exclude defendant from the examination of the children at the pretrial availability hearing, because such an application of OEC 803(18a)(b) (1991) would violate defendant's right to confront his accusers under the Confrontation Clauses of Article I, section 11, of the Oregon Constitution,[7] and the Sixth Amendment to the United States Constitution.[8] *Kitzman,* 129 Or App at 524-27. That court held that the trial court's interpretation and application of OEC 803(18a)(b) (1991) required reversal of the convictions involving M and L2. *Id.* at 527. The Court of Appeals rejected defendant's argument that "the convictions relating to L are inextricably intertwined with M's and L2's statements, which were admitted as a result of the hearing under OEC 803(18a)(b)," and that, therefore, L's convictions should be reversed as well. *Ibid.* The court also rejected defendant's argument that the trial court should have granted defendant's pretrial motion to dismiss the indictment or, in the alternative, to exclude evidence concerning

---

[6] The text of ORS 418.747 (1991) is found at 323 Or 595 n 9 below. That statute was the pertinent statute in force at all material times.

[7] Article I, section 11, of the Oregon Constitution, provides in part:

"In all criminal prosecutions, the accused shall have the right * * * to meet the witnesses face to face, and to have compulsory process for obtaining witnesses in his favor[.]"

[8] The Sixth Amendment to the United States Constitution provides in part:

"In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him[.]"

The Confrontation Clause of the Sixth Amendment is made applicable to the states through the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Pointer v. Texas,* 380 US 400, 403-06, 85 S Ct 1065, 13 L Ed 2d 923 (1965).

interviews conducted with L, because those interviews were conducted in violation of ORS 418.747 (1991). *Id.* at 530-31.

Both defendant and the state petitioned this court for review, and we allowed both petitions. The state argues that the Court of Appeals erred when it held that the trial court's interpretation and application of OEC 803(18a)(b) (1991) would violate defendant's rights under the Confrontation Clauses of the state and federal constitutions. Defendant contends that the Court of Appeals erred by not reversing defendant's convictions as to L, for two reasons. First, defendant argues that, because interviews of the children were conducted in violation of ORS 418.747 (1991), the hearsay statements by L2 and M made at those interviews should not have been admitted at trial. Defendant then reasons that, because those statements were an important part of the state's case concerning defendant's alleged crimes against L, when those statements are properly excluded, defendant's convictions as to L cannot stand. Second, defendant argues generally that the convictions relating to L are inextricably intertwined with the hearsay statements of L2 and M and, therefore, that if defendant's convictions as to L2 and M must be reversed, so too must his convictions as to L.

## II.  SUBCONSTITUTIONAL ISSUES

We begin our analysis with defendant's subconstitutional arguments. *See State v. Esplin*, 314 Or 296, 300, 839 P2d 211 (1992) (stating that this court addresses subconstitutional claims before constitutional claims, and then state constitutional claims before federal constitutional claims).

### A.  *ORS 418.747 (1991)*

■      Defendant's first subconstitutional argument is that the trial court erred by not dismissing the charges or, in the alternative, by not excluding evidence because of an alleged violation of ORS 418.747 (1991).[9] Defendant argues that M,

---

[9] ORS 418.747 (1991) provided in part:

"(1) The district attorney in each county shall be responsible for developing interagency and multidisciplinary teams to consist of but not be limited to law enforcement personnel, Children's Services Division protective service workers, school officials, health departments and courts, as well as others specially trained in child abuse and child sexual abuse investigation.

L, and L2 all were interviewed several times while the "interviewing safeguards" of ORS 418.747 (1991) were not in place.

Specifically, defendant's argument is premised on the theory that Dr. Judith Bays, Detective Steven McBane, and prosecutor Peter Fahy, who interviewed the children for investigatory purposes in this case, had not received the training mandated by ORS 418.747 (1991).[10] In his brief, defendant reasons that, "[b]ecause ORS 428.747 was enacted to protect against 'contamination' of child witnesses and to assure that their testimony is the result of personal knowledge and not improper suggestive interviews, violations of the statutory mandate require" dismissal of the case or, at least, exclusion of the interviewers' testimony.

This court has stated that "[v]iolation of a law by law enforcement personnel does not necessarily require suppression." *State v. Trenary*, 316 Or 172, 176, 850 P2d 356 (1993). This court

"has maintained the principle that *those rules of law designed to protect citizens against unauthorized or illegal searches or seizures of their persons, property, or private effects* are to be given effect by denying the state the use of

---

"* * * * *

"(3) Each team member and those conducting child abuse investigations and interviews of child abuse victims shall be trained in risk assessment, dynamics of child abuse and child sexual abuse, legally sound and age appropriate interview and investigatory techniques.

"(4) All investigations of child abuse and interviews of child abuse victims shall be carried out by appropriate personnel using the protocols and procedures called for in this section. If trained personnel are not available in a timely fashion and, in the judgment of a law enforcement officer or division employee, there is reasonable cause to believe a delay in investigation or interview of the child abuse victim could place the child in jeopardy of physical harm, the investigation can proceed without full participation of all personnel. This authority applies only for as long as reasonable danger to the child exists. A reasonable effort to find and provide a trained investigator or interviewer shall be made.

"(5) Protection of the child is of primary importance."

ORS 418.747 (1991) was the pertinent statute in force at all material times. The legislature amended that statute in 1995, by adding further wording to ORS 418.747(5). Or Laws 1995, ch 134, § 1. That amendment does not affect our analysis.

[10] Dr. Bays and Detective McBane testified at trial. Mr. Fahy was the prosecutor at trial.

evidence secured in violation of those rules against the person whose rights were violated." *State v. Davis*, 295 Or 227, 237, 666 P2d 802 (1983) (emphasis added).

*See also Trenary*, 316 Or at 176 (in the absence of a constitutional violation or express statutory requirement of exclusion, evidence obtained in violation of a statute should be suppressed if the law was designed to protect citizens against illegal searches and seizures).

Applying that doctrine, this court previously has concluded that suppression was not an available remedy for some statutory violations by law enforcement personnel. For example, in *Trenary*, this court held that a police officer's failure to follow the officer's statutory duty to inform a driver, who is suspected of driving under the influence of intoxicants, of the consequences of refusing to take field sobriety tests did not require suppression of those test results. That was so because the purpose of that statute was not to create a right for drivers, but rather to put pressure on them to perform field sobriety tests. *Id.* at 176-78. In *State v. Brock*, 294 Or 15, 22, 653 P2d 543 (1982), this court held that suppression of evidence was not required when police officers seized evidence pursuant to a search warrant that erroneously authorized the warrant to be executed at night. The court reasoned that the law limiting nighttime searches was "concerned with minimizing the heightened risks and apprehensions associated with a nighttime intrusion into the home, not with overall protection against unjustified searches and seizure of persons or property." *Ibid.*; *see also State v. Valentine/Darroch*, 264 Or 54, 68, 504 P2d 84 (1972) (evidence obtained in violation of "knock and announce" statute was admissible), *cert den* 412 US 948 (1973).

Defendant's argument that ORS 418.747 (1991) compels suppression of evidence gathered in violation of its terms requires us to interpret ORS 418.747 (1991) to determine whether that statute is a "rule[ ] of law designed to protect citizens against unauthorized or illegal searches or seizures of their persons, property, or private effects." *See Davis*, 295 Or at 237 (stating quoted standard). In interpreting a statute, our goal is to discern the intent of the legislature. ORS 174.020; *PGE v Bureau of Labor and Industries*, 317 Or

606, 610, 859 P2d 1143 (1993). At the first level of analysis, we examine the text and context of the statute. If the legislature's intent is clear from those inquiries, no further inquiry is made. *Id.* at 610-11.

Nothing in the text of ORS 418.747 (1991) suggests that the remedy for a violation of its terms is exclusion of evidence improperly gathered. There is no "express statutory requirement of exclusion." *See Trenary*, 316 Or at 176 (stating quoted criterion).

Moreover, the context of ORS 418.747 (1991) disposes of defendant's argument. ORS 418.747 (1991) was part of a broader statutory scheme concerning "mandatory reports and investigations of abuse of children." ORS 418.745 (1991).[11] *See generally* ORS 418.740 to 418.775 (1991) (providing means and requirements for reporting and investigation of allegations of child abuse). That statutory scheme included a policy statement, which provided that the "purpose" of the statutes governing mandatory reporting and investigation of child abuse was to

> "facilitat[e] the use of protective social services to prevent further abuse, safeguard and enhance the welfare of abused children, and preserve family life when consistent with the protection of the child by stabilizing the family and improving parental capacity." ORS 418.745 (1991).

That express policy statement shows that the legislature enacted ORS 418.747 (1991) with three purposes in mind: prevention of child abuse, protection of children from abuse, and preservation of family life when consistent with the protection of children from abuse. None of those purposes suggests that ORS 418.747 (1991) was "designed to protect citizens against unauthorized or illegal searches or seizures of their persons, property, or private effects." *See Davis*, 295 Or at 237 (stating quoted standard).

The legislature's intent also appeared in ORS 418.747(5) (1991), which provided: "[p]rotection of the child is of primary importance." When that provision is read along with ORS 418.745 (1991), it shows that the legislature, when

---

[11] ORS 418.745 (1991) was repealed in 1993. Or Laws 1993, ch 546, § 141. However, ORS 418.745 (1991) was in effect both when the interviews of the children occurred in this case and throughout defendant's trial.

it enacted ORS 418.747 (1991), intended to make protection of the child the primary purpose of ORS 418.747; the other two concerns delineated in ORS 418.745 (1991)—prevention of further abuse and preservation of the family—both were secondary to that specified primary concern.

The development of ORS 418.747(5) further demonstrates that the legislature did not intend that a violation of ORS 418.747 (1991) result in the suppression of evidence improperly obtained. *See Bayridge Assoc. Ltd. Partnership v. Dept. of Rev.*, 321 Or 21, 30, 892 P2d 1002 (1995) (enactment and amendment of a statute is pertinent context in construing that statute). ORS 418.747 was first enacted by the legislature in 1989. Or Laws 1989, ch 998, § 4. ORS 418.747(5) (1989) provided:

> "Protection of the child is of primary importance. In no case should the criminal investigation take precedence over the safety of the child."

In 1991, the legislature removed the second sentence of that provision. Or Laws 1991, ch 451, § 1. In 1991, then, the legislature deleted from ORS 418.747(5) a limitation on the ability of prosecutors to initiate criminal investigations of allegations of child abuse. The deletion of a requirement that criminal investigations not take precedence over the safety of the child suggests a legislative intent to *enhance* the ability to prosecute cases involving child abuse. The development of ORS 418.747 (1991) thus is antithetical to the notion that the legislature intended to *protect* criminal defendants from unauthorized or illegal searches or seizures. It points in precisely the opposite direction.

Our review of the text and context of ORS 418.747 (1991) shows that the intent of the legislature was to protect children, not alleged perpetrators of child abuse, from potentially harmful investigatory techniques. Accordingly, we need proceed no further in our inquiry into the legislative intent behind ORS 418.747 (1991).[12] Defendant's argument is not well taken.[13]

---

[12] Because of our conclusion, we need not consider whether the evidence that defendant sought to exclude actually was obtained in violation of ORS 418.747 (1991).

[13] Defendant also argues that Detective McBane was required to complete a specific training course delineated in ORS 418.640(3) and that, because he did not, evidence from the interviews that he conducted of L and M must be suppressed.

## B. *OEC 803(18a)(b) (1991)*

### 1. *Statutory Analysis*

■　　Defendant's second subconstitutional argument is that the trial court improperly interpreted OEC 803(18a)(b) (1991)[14] to allow the court to exclude defendant from the pretrial availability hearing, while L2 and M were testifying,

---

Defendant's reliance on ORS 418.640(3) is misplaced. ORS 418.640 is concerned with "protect[ing] the best interests of children in foster homes." ORS 418.640(1). The training for law enforcement officer investigating allegations of child abuse, referred to in ORS 418.640(3), pertains to allegations of child abuse in foster homes. The children in this case were not in foster homes. Accordingly, that statute is not applicable here.

[14] OEC 803(18a)(b) (1991) provided in part:

"The following are not excluded [as hearsay], even though the declarant is available as a witness:

"\* \* \* \* \*

"A statement made by a child victim, which statement concerns an act of sexual conduct performed with or on the child by another, is not excluded [as hearsay] if the child either testifies at the proceeding and is subject to cross-examination or is under 12 years of age and is unavailable as a witness. However, when a child under 12 years of age is unavailable as a witness, the statement may be admitted in evidence only if the proponent establishes that the time, content and circumstances of the statement provide indicia of reliability, and in a criminal trial that there is corroborative evidence of the act of sexual conduct and of the alleged perpetrator's opportunity to participate in the conduct and that the statement possesses indicia of reliability as is constitutionally required to be admitted. No statement may be admitted under this paragraph unless the proponent of the statement makes known to the adverse party the proponent's intention to offer the statement and the particulars of the statement no later than 15 days before trial, except for good cause shown. For purposes of this paragraph, in addition to those situations described in [OEC 804(1)], the child shall be considered 'unavailable' if the child has a substantial lack of memory of the subject matter of the statement, is presently incompetent to testify, is unable to communicate about the sexual conduct because of fear or other similar reason or is substantially likely, as established by expert testimony, to suffer lasting severe emotional trauma from testifying. Unless otherwise agreed by the parties, the court shall examine the child in chambers and on the record or outside the presence of the jury and on the record. The examination shall be conducted immediately prior to the commencement of the trial in the presence of the attorney and the legal guardian or other suitable adult as designated by the court. If the child is found to be unavailable, the court shall then determine the admissibility of the evidence. \* \* \* The purpose of the examination shall be to aid the court in making its findings regarding the child's availability as a witness and the reliability of the child's statement."

The legislature amended OEC 803(18a)(b) in 1995. Or Laws 1995, ch 476, § 2. Those amendments do not affect our analysis. OEC 803(18a)(b) (1991) was the pertinent statute in force at all material times.

and to prevent examination by defendant's lawyer of L2 and M at that hearing.[15]

The pertinent text of OEC 803(18a)(b) (1991) provides that, at the pretrial availability hearing, "the court shall examine the child" and that "[t]he examination shall be conducted * * * in the presence of the attorney and the legal guardian or other suitable adult as designated by the court." That evidentiary statute lists who shall be present at the pretrial availability hearing—the lawyer and the legal guardian or another suitable adult designated by the court. The statute also specifies who shall conduct the examination—the court. That text contains no mention of a defendant or of a defendant's right to examine the child.

That legislative silence plausibly may be interpreted in at least three ways. It may be interpreted to indicate that the legislature intended to preclude a defendant from facing the child and to preclude examination by the defendant's lawyer in an OEC 803(18a)(b) (1991) pretrial availability hearing. *Compare* OEC 803(24) (when child under 12 testifies about sexual abuse, closed circuit television may be used in certain circumstances; cross-examination and presence of the defendant are provided for). Or, that silence may be interpreted as the absence of any rule respecting examination by a defendant's lawyer and the defendant's presence, leaving the matter to the trial court's discretion. Or, as defendant contends, that silence may implicitly incorporate permission for examination by a defendant's lawyer and the defendant's presence, because those familiar rights of criminal defendants were assumed by the legislature when it enacted the statute.

The legislature's intent is not clear from the text and context of OEC 803(18a)(b) (1991). We therefore consider the legislative history of that statute. *See PGE*, 317 Or at 611-12 (describing method of analysis). We have examined that legislative history and find it uninformative. The historical record is silent as to the questions presented in this case.

---

[15] We do not decide whether the trial court has authority under OEC 803(18a)(b) (1991) to allow the state to examine a child.

■■    When, after consideration of the text, context, and legislative history of a statute, the intent of the legislature remains unclear, then the court resorts to general maxims of statutory construction to resolve the uncertainty. *PGE*, 317 Or at 612. Here, the applicable maxim is that, when one plausible construction of a statute is constitutional and another plausible construction of a statute is unconstitutional, courts will assume that the legislature intended the constitutional meaning. Statutes therefore will be construed accordingly. *See State v. Smyth*, 286 Or 293, 296, 593 P2d 1166 (1979) (applying that maxim). Application of that maxim is particularly apt in this instance; legislators who enacted OEC 803(18a)(b) repeatedly emphasized their desire to pass a statute that would not infringe unconstitutionally on a defendant's confrontation rights. *See, e.g.*, Tape Recording, Senate Judiciary Committee, SB 275, February 27, 1989, Tape 46, Side A at 394 (Statement of Sen. Hill) ("We don't want to pass anything that's unconstitutional."); Minutes, Senate Judiciary Committee, SB 275, February 27, 1989, Page 7 (Statement of Sen. Shoemaker) (indicating a desire to pass a constitutional statute).

    The application of the foregoing maxim requires us to move to what ordinarily is the next section of the analysis, the state constitutional arguments.[16] As will be explained below, it is a violation of Article I, section 11, of the Oregon Constitution (1) to exclude a defendant from a pretrial availability hearing while a child who allegedly is a victim of sexual abuse is testifying, and (2) to preclude a defendant's lawyer from examining the child at such a hearing. That being so, we interpret OEC 803(18a)(b) (1991) to allow (1) a defendant to be present at a pretrial availability hearing while a child who allegedly is a victim of sexual abuse is testifying and (2) defense counsel to examine the child at such a hearing. The trial court's contrary interpretation in this case was error.

2. *Application of Article I, section 11, of the Oregon Constitution*

    Defendant argues that his exclusion from the pretrial availability hearing, while M and L2 were testifying,

---

[16] We consider state constitutional claims before considering federal constitutional claims. *State v. Esplin*, 314 Or 296, 300, 839 P2d 211 (1992).

and the refusal of the court to allow defense counsel to examine M and L2 at that hearing, violated his right to confront witnesses under Article I, section 11, of the Oregon Constitution, quoted above at note 7, and the Sixth Amendment to the United States Constitution, quoted above at note 8. The state argues that defendant's confrontation rights do not attach at a pretrial availability hearing and that, even if they do, defendant's confrontation rights were not violated by the trial court's application of the statute in this case.

This court has described the purposes of the right of confrontation contained in Article I, section 11, as follows:

"The right of confrontation protects two vital interests of the defendant. First, it guarantees that the defendant has an opportunity to cross-examine the witness against him in order to test [the witness'] sincerity, memory, ability to perceive and relate, and the factual basis of [the witness'] statements. This purpose of confrontation helps to assure the accuracy of the result of the truth-determining process by giving the accused an opportunity to test the recollection and sift the conscience of a witness. * * *

"The second interest of the defendant which the right to confrontation protects is enabling the defendant to demonstrate to the jury the witness' demeanor when confronted by the defendant so that the credibility of the witness is displayed in the courtroom. This second purpose is no less important than the first." *State v. Herrera*, 286 Or 349, 353-54, 594 P2d 823 (1979).

At the same time, this court also has recognized that there are some limitations on a defendant's confrontation rights:

"The confrontation clause, while guaranteeing the defendant the right to confront a witness face to face, is not without exception. One such exception under which prior recorded testimony which was subject to cross-examination may be introduced into evidence at trial exists when a witness is truly unavailable to testify at a trial. However, because of the defendant's strong interest in confronting his accusers and the prosecutor's duty to provide a fair trial for the defendant and protect the defendant's constitutional rights, the prosecutor's invocation of this exception cannot be granted routinely." *Id.* at 354-55 (citation omitted; footnote omitted).

As noted above, the state first argues that defendant's confrontation rights were not violated because, it asserts, "[c]onfrontation is a trial right * * * that is only remotely implicated, if at all, in this context." The state reasons that availability is an issue that is committed to the trial court "for a neutral determination, rather than to the adversarial process." From that premise, the state argues that defendant's confrontation rights did not attach at a pretrial availability hearing, because there was no "confrontation." The state reasons that it "would have been premature at the preliminary competency or unavailability hearing [to probe M's and L2's credibility, because] the point [of that hearing] was to determine whether they were capable of relating their testimony at all." This court's decision in *State v. Campbell*, 299 Or 633, 705 P2d 694 (1985), answers the state's argument.

In *Campbell*, the defendant was convicted of sodomy in the first degree. His conviction rested, in part, on testimony of the mother of the three-year-old victim. The mother recounted the child's statements that the sodomy had occurred. 299 Or at 635-36. This court considered whether the hearsay statement of a three-year-old declarant, who was the alleged victim of sodomy, was admissible in evidence. *Id.* at 635. The court held that the child's statements contained sufficient indicia of reliability to be admitted at trial. *Id.* at 650-51. This court remanded the case to the trial court, however, because that court had accepted the parties' *stipulation* that the child was unavailable to testify and had not made an independent determination of whether the child was unavailable. *Id.* at 651-53. In reaching that conclusion, the court engaged in the following discussion:

"We believe that the question of unavailability of a hearsay declarant supposedly due to incompetency should not be left to the advocates in a criminal trial. The prosecution would be relieved from calling the witness and the defense relieved from having the witness appear for trial. *If the court is going to admit hearsay statements against a defendant[,] to satisfy the confrontation rights of an accused, the court must ensure the declarant is in fact unavailable.* * * *

"We are aware that many three-year-olds are found to be incompetent after close evaluation by judges conducting trials. On the other hand, many children of tender years make remarkably credible witnesses for either the prosecution or the defense in a criminal trial. Because there is so much variance among children, we believe only the trial judge can make a ruling on competency. *We hold, therefore, that before any out-of-court declaration of any available living witness may be offered against a defendant in a criminal trial, the witness must be produced and declared incompetent by the court to satisfy * * * Article I, section 11, of the Oregon Constitution * * *." Id.* at 651-52 (emphasis added; footnote omitted).

We cite *Campbell* here to show that this court has previously concluded, albeit by implication, that a defendant's confrontation rights attach at a pretrial availability hearing.[17]

■      In other words, in a criminal proceeding, if a living witness is *not* declared incompetent by a trial court, and that witness' hearsay[18] statements are admitted at trial as evidence against the defendant, the defendant's rights under Article I, section 11, of the Oregon Constitution, are violated. It follows that, when the state seeks to introduce such hearsay statements, the unavailability of the declarant first must be shown, in order to secure the defendant's rights under Article I, section 11. The pretrial availability hearing serves as one means of protecting a defendant's confrontation rights.

The state's attempts to differentiate between a "trial" and a pretrial availability hearing of this kind, for the purposes of Article I, section 11, are unconvincing. At that hearing, the trial court determines whether a prosecution witness will testify and whether evidence of that witness' statements will be admitted at trial.

---

[17] In this case, defendant did not stipulate as to M's or L2's unavailability. Accordingly, nothing in our decision today requires us either to apply or to reconsider this court's holding in *Campbell* that the parties to a criminal proceeding cannot stipulate as to a witness' unavailability.

[18] The statements from M, L, and L2 are hearsay, because they are "statement[s], other than one[s] made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted," OEC 801(3), and are not statements classified by OEC 801(4) as nonhearsay. The parties do not contend otherwise.

■ We hold, therefore, that it is a violation of Article I, section 11, (1) to exclude a defendant from a pretrial availability hearing while a child who allegedly is a victim of sexual abuse is testifying, and (2) to preclude a defendant's lawyer from examining the child at such a hearing. Accordingly, the trial court erred in (1) excluding defendant from the pretrial availability hearing while M and L2 were testifying, and (2) precluding defense counsel from examining M and L2 at that hearing.

As previously noted, the Court of Appeals reached the same conclusion that we do with respect to the applicability of confrontation rights to a hearing under OEC 803(18a)(b) (1991). Without analysis, the Court of Appeals then held that, because the trial court's application of OEC 803(18a)(b) (1991) violated defendant's constitutional right of confrontation, reversal of the convictions involving M and L2 was required. 129 Or App at 527. For the following reasons, we agree with that court's conclusion as to the convictions involving crimes against M, but disagree as to the convictions involving crimes against L2.

### III. PRETRIAL AVAILABILITY HEARING

As noted, the trial court held an availability hearing with respect to M and L2. And, we have held that the trial court erred in excluding defendant from that hearing while M and L2 were testifying and in precluding defense counsel from examining M and L2 at that hearing. We next consider whether the trial court's error requires reversal of defendant's convictions involving crimes against M and L2.

■ This court has held that an error in a criminal trial in Oregon is harmless if there is little likelihood that the error affected the verdict. *State v. Pinnell*, 319 Or 438, 446 n 9, 877 P2d 635 (1994); *see also State v. Walton*, 311 Or 223, 230-31, 809 P2d 81 (1991) (applying harmless error analysis to claimed constitutional error). We next proceed to apply that standard.

## A. *Harmless Error with Respect to M*

█  With respect to M, we are unable to say that there is "little likelihood that the error affected the verdict." *See Pinnell*, 319 Or at 446 n 9 (stating standard) (internal quotation marks omitted).

The trial court examined M in the courtroom, outside the presence of defendant. The court began the examination by asking M how old he was, when his birthday was, where he was attending school, and what grade he was in. M was able to answer those questions. The court then asked M if he understood that there was going to be a trial about things that had happened to him, and M said that he understood. The court then asked M repeatedly if he would be willing to talk about things that had happened to him. M repeatedly stated: "I don't want to talk about it."

The court then concluded the interview with M and made the following statement:

> "As to the availability question, I don't know what further I can go into. * * * I think he is of a mind set that he is pretty clear that he's not desirous of talking about it. * * *
>
> "* * * * *
>
> "I haven't made that finding [as to availability] yet. *I don't think there's any question he is a very competent witness. But he is obviously frightened. He understood everything I said.*
>
> "And the next question is, how far can I push to get him to disclose what he doesn't wish to disclose." (Emphasis added.)

After the examination of M, M's mother testified at the pretrial availability hearing. She testified that M had told her, during the previous month, "that his dad had not ever done anything to him." That was the last time, before the hearing, that M had talked with his mother about the events at issue in this case.

The court found that M was unavailable to testify because, "either out of fear or other similar reason, [he] is unable to communicate or will not communicate." Later, the

court clarified that ruling: "I found * * * that [M] was unable [to communicate], either by fear or for some other reason, such as wanting to protect a parent."[19] The trial court also found that M was likely "to suffer lasting and severe emotional trauma from testifying."

One function of the pretrial availability hearing was to determine the reliability of M's statements. Defendant's lawyer was prevented from questioning M about his unwillingness to testify or his apparent recantation concerning defendant's acts. Inquiry as to the witness' unwillingness to testify may have disclosed either an improper influence on the witness by the prosecution or the child's mother (as defendant alleges) or, alternatively, eventually may have disclosed a willingness on the part of the witness to communicate about some of the events at issue. We are unable to discern what would have happened, and what the trial court would have determined as to M's availability, had M been questioned in defendant's presence or by defendant's counsel. We cannot say with confidence that, on this record, there is "little likelihood" that further examination would have yielded results favorable to defendant.

M did not testify at trial. Had the trial court determined that M was available, he would have been called as a witness. The somewhat equivocal nature of his out-of-court statements means that the opportunity by defense counsel to examine him was especially important.

The Court of Appeals did not err when it reversed defendant's convictions of crimes involving M.[20]

---

[19] For the purpose of this discussion, we assume, without deciding, that the trial court's stated basis for concluding that M was unavailable is legally sufficient. *But see Maryland v. Craig*, 497 US 836, 855-86, 110 S Ct 3157, 111 L Ed 2d 666 (1990) ("[I]f the state makes an adequate showing of necessity, the state interest in protecting child witnesses from the trauma of testifying in a child abuse case is sufficiently important to justify the use of a special procedure that permits a child witness in such cases to testify at trial against a defendant in the absence of face-to-face confrontation with the defendant [as provided in the federal Confrontation Clause]. * * * Denial of face-to-face confrontation is not needed to further the state interest in protecting the child witness from trauma unless it is the presence of the defendant that causes the trauma.").

[20] Because of our holding under state law, we need not reach a federal error or harmless error analysis with respect to the pretrial availability hearing involving M.

## B.   *Harmless Error with Respect to L2*

█     With respect to L2, however, we hold that the deprivation of defendant's confrontation rights was harmless error. Defendant's presence, and counsel's examination of this three-year-old, who was too young and demonstrably too bewildered to understand what was going on in court or to give responsive answers in court to even the easiest of questions, would have been futile to establish availability.

### 1.   *State Law Standard*

For the following reasons, we are convinced that there is little likelihood that the error affected the verdict.

L2 was three years old at the time of the pretrial availability hearing. The trial court attempted to make the setting for the examination of L2 as comfortable as possible. The examination was held in chambers, instead of in the courtroom. L2's maternal grandmother sat by her throughout the examination. L2 brought a toy with her.

The court began the examination by asking L2 a series of nonsubstantive questions. L2 did not give verbal responses to even the simplest questions concerning her age and whereabouts. She also failed to give verbal responses when asked about her parents and about whether she was in school.

L2 gave very simple verbal responses to some questions that the court asked her about a stuffed toy that she was holding. When the court asked L2 if she had a puppy, L2 responded, "[P]uppies." When the court asked L2 if she liked puppies, L2 responded, "Two puppies."

L2 did not respond to questions concerning why she was there, the nature of the proceeding, or what a court is. The court then ended the interview with L2.

The court ruled that L2 was unavailable as a witness due to age and inability to communicate in a court setting, stating:

> "This morning after interviewing [L2] I am not sure that she is capable of testifying, even under the best of circumstances, about anything other than possibly a little seal

animal that she had with her in chambers. And that was about it.

"She wasn't, at three years old, expected to do much. But, certainly, I don't think that she would be able to testify in a case of this nature as to questions put to her. And other than spontaneous statements made, I am not sure that she understands anything more about what has gone on.

"I think one of the later witnesses—her father indicated that she didn't have a clue as to what was going on in this particular hearing. And I seemed to feel that was the case this morning."

To be deemed competent, a witness must be able to communicate the witness' perceptions to others. OEC 601; *see also State v. Milbradt*, 305 Or 621, 624, 756 P2d 620 (1988) (so holding). Furthermore, whether a witness' ability to perceive and communicate is sufficient to make the witness competent under OEC 601 is an issue for the trial court to determine. *See* OEC 104(1) ("[p]reliminary questions concerning the qualification of a person to be a witness * * * shall be determined by the court"); *see also Milbradt*, 305 Or at 624 (quoting OEC 601 Commentary (1981) with approval); *Campbell*, 299 Or at 652 ("[b]ecause there is so much variance among children, we believe only the trial judge can make a ruling on competency").

Nothing in the record offers the slightest basis for concluding that defendant's presence would have altered the trial court's determination that L2 was unavailable to testify. The transcript demonstrates L2's fundamental inability to understand the nature of what was happening or why she was there. Defendant's presence would not have altered that inability of L2 to understand the nature of what was going on around her, and examination of L2 by defense counsel would not have altered her inability to communicate meaningfully in a court setting. In short, defendant's presence at the pretrial availability hearing, and examination of L2 by defense counsel at that hearing, would have amounted to nothing more than "a futile act" in an attempt to secure defendant's confrontation rights.[21] Confrontation rights do not encompass a right to require futile acts. *See State v. Stevens*, 311 Or

---

[21] Defendant appears to recognize that fact. In his brief to this court, defendant states:

119, 141, 806 P2d 92 (1991) (holding that, before a witness is declared unavailable so that the witness' hearsay statements may be admitted at trial, the party seeking to admit those statements must make "a good-faith effort to obtain the testimony * * * although it need not perform a futile act").

On review, defendant argues that defense counsel was better qualified to elicit usable testimony from a very young child than was the trial judge. The record, however, contains no such assertion by defendant, nor does it contain facts from which such a conclusion could be drawn. Indeed, when the trial court invited comments on the questioning of L2, defense counsel had nothing to say.[22]

## 2. *Federal Law Standard*

In general, federal constitutional error is deemed harmless if the appellate court concludes beyond a reasonable doubt that the error did not contribute to the conviction. *See Chapman v. California*, 386 US 18, 24, 87 S Ct 824, 17 L Ed 2d 705 (1967) (stating standard). The Court also has held expressly that the denial of a defendant's right to examine the state's witnesses is subject to a harmless error analysis. *See Delaware v. Van Arsdall*, 475 US 673, 682, 106 S Ct 1431, 89 L Ed 2d 674 (1986) ("the denial of the opportunity to cross-examine an adverse witness does not fit within the limited category of constitutional errors that are deemed prejudicial in every case"); *see also Arizona v. Fulminante*, 499 US 279, 306-08, 111 S Ct 1246, 113 L Ed 2d 302 (1991) (*Van Arsdall* cited as an example of "trial error" to which harmless error

---

"No showing of necessity for the removal of * * * defendant could have been made with respect to *either* [L2 or M]. As to [L2], there is nothing on the record which provides any reason to believe that she would have any reaction at all to being in the presence of [defendant]. Indeed the child was so young that it appears that she was not even cognizant of what the whole matter was about." (Emphasis in original.)

[22] After the trial court questioned L2, but before the pretrial availability hearing was completed, the court said to counsel: "Okay, I don't have any further questions. Does anybody have anything they want to say to me?" Defense counsel replied, "I have nothing." Later, after the trial court made a tentative ruling "that [L2] is unavailable as a witness to testify due to age and inability to communicate," defendant voiced no objection. Finally, after the last witness had testified, the trial court again invited "any remarks the parties want to make" before making a final ruling. Defense counsel said, "Your Honor, I have no remarks regarding availability/unavailability."

analysis applies). Similarly, the Court has stated that the denial of a defendant's right to face adverse witnesses is subject to a harmless error analysis. *See Coy v. Iowa*, 487 US 1012, 1021, 108 S Ct 2798, 101 L Ed 2d 857 (1988) ("We have recognized that other types of violations of the Confrontation Clause are subject to harmless error analysis, and see no reason why denial of face-to-face confrontation should not be treated the same.") (Citation omitted.)

Our discussion of why the denial of defendant's right to confront and examine L2 at the pretrial availability hearing was harmless error under the Oregon Constitution suffices here as well. Defendant's presence at the hearing would not have altered the trial court's determination that L2 was unavailable to testify; nor would examination of L2 by defense counsel have affected that determination. Any federal Confrontation Clause error that occurred regarding defendant's right to face and the right to examine L2 at the pretrial availability hearing was harmless.

## IV. HARMLESS ERROR ANALYSIS WITH RESPECT TO THE TRIAL

■ We have held that it was error to admit M's hearsay statements at trial, that the error in the manner of conducting the pretrial availability hearing as to M was not harmless, and that defendant's convictions of crimes involving M must be reversed. That being so, we next must consider the effect on the remaining convictions of admitting M's statements at trial.

M's hearsay statements admitted at trial consisted of the following:

- Valerie Kitzman testified that M had told her that defendant had "played" with M's penis and "butt" many times, that defendant would rub his penis and face against M's buttocks, and that defendant had put his finger in M's anus. She testified that M said that the last-named acts had "really hurt," "because of his fingernail." She also testified that M recanted, and later told her that "[m]y daddy never did this to me."

- Gail Smiley-Dradoff, who had a son who was a playmate of M's, testified that she overheard a conversation between M and her children in which M said that defendant had given M "shots without a needle," on the "inside" of the top of the back of his leg, and that it "hurt, very, very bad."

- Pat Warner, a therapist that Valerie Kitzman took M to see, testified that M told her that he got "scared at night," because defendant had "rubbed my private parts. And it hurt." Warner asked him, "What private parts?" M responded, "My butt and my penis," and demonstrated different rubbing motions on his own body. Warner testified that M told her that defendant "rubbed me with his face and his chin" many times and that defendant had given him a rash on his crotch.

- Dr. Bays testified that, during her examination of M, M told her that defendant had touched M's buttocks and penis with defendant's face.

- Detective McBane testified that the first time he interviewed M, M denied that defendant had sexually abused him. Detective McBane further testified that the second time he interviewed M, M told him that defendant had touched his penis and buttocks with defendant's face, that defendant had rubbed his penis, and that defendant had "hurt him with his fingernails" on M's penis and buttocks. Detective McBane also testified that M told him that defendant's fingers had touched M "on the inside of his butt" many times.

As noted above, under Oregon state law, an error in a criminal trial is harmless if there is little likelihood that the error affected the verdict. *See Pinnell*, 319 Or at 446 n 9 (stating Oregon's harmless error standard).

Here, there are several factors that weigh in favor of a conclusion that the error in admitting M's hearsay statements meets that standard:

1. The evidence of defendant's guilt of the charged offenses was extensive, vivid, and powerful. For example, L testified in detail about four separate occasions when

defendant raped her. She further testified to other acts of sexual abuse that defendant had committed against her. L also testified that she saw defendant "grabbing [L2's] boobs and pushing his fingers on her vagina."

2. There was substantial corroborating, admissible evidence. For example, several witnesses testified about changes in L's and L2's behavior (such as L's loss of bowel and bladder control and L2's uncontrollable tantrums) that, in retrospect, they attributed to sexual abuse. Additionally, medical evidence—an abnormal hymen and vaginal wall—corroborated L's testimony.

3. None of M's statements implicated defendant directly in any crime involving a child other than M. His statements were to the effect that defendant had abused *him* sexually and that M had recanted. Also, admissible evidence corroborated some of M's statements.

4. The trial court properly instructed the jury—in the form that defendant himself requested—to consider the evidence respecting each child separately. This court presumes that jurors "follow[ ] their instructions, absent an overwhelming probability that they would be unable to do so." *State v. Smith,* 310 Or 1, 26, 791 P2d 836 (1990).

However, other factors detract from a conclusion that the error in admitting M's hearsay statements at trial was harmless as to the charges involving L and L2:

1. M's statements were graphic and disturbing. Some of them (especially their details) were not corroborated by admissible evidence.

2. With respect to L, much of the state's evidence consisted of L's testimony and hearsay statements. Defendant denied having committed the charged crimes. Consequently, the jury's assessment of L's credibility was crucial. In view of L's four-month delay in reporting the crimes, and in view of her testimony that she had recanted in the past and that she did not want her mother and defendant "together anymore," it is possible that the jury borrowed some comfort from the erroneously admitted hearsay statements of M in deciding to believe L and disbelieve defendant.

3. With respect to L2, much of the state's evidence consisted of L2's hearsay statements. Therefore, that evidence had the same indirect quality as M's statements.

This is a close case. On balance, we are unable to hold that there is little likelihood that the error in admitting M's hearsay statements at trial affected the verdict as to the charges involving L and L2. Accordingly, we must reverse defendant's convictions for crimes involving L and L2.

## V. DISPOSITION

The decision of the Court of Appeals is affirmed in part and reversed in part. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

**VAN HOOMISSEN, J.,** concurring.

I agree with the decision announced by the majority opinion.

I write separately to express my view that *State v. Campbell*, 299 Or 633, 705 P2d 694 (1985), was wrong in holding that a trial court could not accept the parties' stipulation that the child was unavailable to testify at trial. As I explained in *State v. Adams*, 315 Or 359, 368-69, 847 P2d 397 (1993) (Van Hoomissen, J., concurring):

> "Generally, I see no reason why a criminal defendant should not be permitted to stipulate to virtually anything that he or she chooses as a result of plea discussions. A defendant may plead guilty to the charge. Indeed, a defendant even may plead guilty to aggravated murder, which might result in a sentence of death. A defendant may waive his or her state and federal constitutional rights to counsel, trial, jury, confrontation, and cross-examination. A defendant may stipulate to the admissibility of otherwise inadmissible evidence. A defendant intentionally may fail to raise an otherwise valid objection at trial and, thus, waive the right to raise the issue on appeal. The parties may stipulate to facts. *State v. Lyon*, 304 Or 221, 231, 744 P2d 231 (1987). Why, then, shouldn't he or she be permitted to stipulate to other things?

> "Of course, the parties may not stipulate to certain things, such as to the jurisdiction of the court, *see, e.g., State*

*v. Miner*, 218 Or 502, 504, 342 P2d 773 (1959) (if the court has lost jurisdiction, the parties could not, by stipulation, confer such jurisdiction), or that a defendant could be sentenced to a term of imprisonment beyond the statutory maximum sentence prescribed by law. Generally, the parties may not stipulate as to the law.

"I merely suggest a more generalized proposition of law, *i.e.*, that, *subject to the approval of the court*, the parties should be permitted to stipulate to anything that the court has the authority to approve. This seems somewhat like analogizing plea agreements to contracts, *i.e.*, they create their own "law" and are enforceable so long as they are approved by the court and do not violate public policy." (Emphasis in original; footnotes omitted.)

Notwithstanding, there is no need to reexamine *Campbell* in this case, and I am content to live with it for present purposes.

Gillette, J., joins in this opinion.

**DURHAM, J.,** concurring.

I agree with the majority's decision to reverse defendant's convictions and remand the case for a new trial. I write separately, because I do not agree with all of the majority's reasoning.

The issue is whether the trial court committed error in the manner assigned by defendant and, if so, whether any error is harmful and requires a new trial. The court correctly concludes that the trial court's decision to admit extensive hearsay testimony about M's out-of-court statements was a reversible error that affected the verdict as to charges involving M, L, and L2. That conclusion fully answers the issue on appeal.

Despite that fact, the majority opinion goes on to analyze whether harmless error resulted from the court's deprivation of defendant's confrontation rights *with respect to L2*. The majority concludes that the court committed only a harmless error in that respect. 323 Or at 609-12. The majority does not explain why that discussion is necessary or even relevant to its conclusion that the error regarding admission of M's hearsay statements necessitates a new trial as to all

charges. I can conceive of no legitimate reason connected to the majority's rationale in this case why that discussion appears in the majority opinion. Because that discussion contributes nothing to the reasoning of the majority opinion, it is *dictum*. I do not join in that discussion.

For the reason expressed above, I concur in the result reached by the majority.